Cotto Vives, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
Las recurrentes Pueblo International, LLC, Decemcor, S.E. y P.C.M.E. Commercial, S.E. nos solicitan que revoquemos la resolución JP-047-ZI, titulada Enmienda a la Declaración de Zonas Susceptibles a Inundaciones y Adoptando el Mapa de Zonas Susceptibles a Inundaciones, Hoja 8, para el Municipio de Toa Baja. Dicha *1063 resolución fue emitida por la Junta de Planificación el 19 de junio de 2002 y tuvo el efecto, como indica su título, de enmendar la referida Hoja 8. De conformidad con la reglamentación aplicable, la enmienda entró en vigor el 31 de julio de 2002. 
La enmienda aprobada tuvo el efecto de enmendar el mapa vigente y modificar la clasificación de los terrenos en cuestión en términos de su susceptibilidad a ser objeto de inundaciones, cambiándolos de Zona 1 — donde no se permite prácticamente ningún tipo de desarrollo— a Zona 2, clasificación que permite, bajo ciertas condiciones, el desarrollo. La enmienda decretada tiene el efecto, por lo tanto, de liberar el predio objeto de la solicitud para permitir el desarrollo del mismo, luego de que se obtengan, evidentemente, las autorizaciones y permisos necesarios.
Por los fundamentos que exponemos a continuación, revocamos la Resolución JP-047-ZI y, en consecuencia, la enmienda decretada a la Hoja 8, y devolvemos el caso a la Junta de Planificación para que considere la enmienda solicitada tomando en cuenta los requisitos de ley.
I
Para entender la revisión que nos ocupa es preciso reseñar brevemente el marco dentro del cual ella se inscribe.
El 5 de julio de 2000, La Plata Development Corporation, como proponente, presentó ante la Junta de Planificación una consulta de ubicación mediante la cual propuso la construcción de Riverside Town Center, un desarrollo comercial en el Municipio de Toa Baja, que proveería dos tiendas anclas, además de otros comercios, oficinas, almacenes y servicios, en un área de construcción bruta de 648,400 p.c., sin contar los estacionamientos.
Como se indicó en el formulario de la solicitud de la consulta, se proponía ubicar el centro comercial en un solar de aproximadamente 38.5 cuerdas, propiedad del Sr. Oscar Nevárez del Valle, a segregarse de una finca de mayor tamaño, y que colinda, al norte, con la PR-22, al sur, con la PR-2, al oeste, con la PR-165, y por el este, con el Río La Plata.
De acuerdo con el Mapa de Zonas Susceptibles a Inundaciones, Hoja 8, vigente en ese momento —fechado el 5 de mayo de 1999 — , parte del predio en cuestión estaba ubicado en Zona 1 y parte en Zona 2, aproximadamente en partes iguales. Del mismo modo, en los mapas desarrollados por la Agencia Federal para el Manejo de Emergencias (FEMA, por sus siglas en inglés), conocidos como Hood Insurance Rates Maps (FIRM), el predio en cuestión aparece clasificado como Zona AE. Véase, “Community Panel Number 720000 0045 E\ revisado el 2 de junio de 1999, incluido como anejo de la Moción en oposición a que se expida el auto de revisión sometida por la Junta de Planificación.
En el memorial explicativo que acompañó la consulta, se señaló que el Cuerpo de Ingenieros de Estados Unidos, en coordinación con el Departamento de Recursos Naturales y Ambientales (DRNA), tiene un proyecto de control de inundaciones en el sector, que incluiría la canalización del Río La Plata y un sistema de diques, uno de los cuales se construiría, según el proyecto propuesto preliminarmente por el Cuerpo de Ingenieros, en el extremo este de los terrenos objeto de la consulta, paralelo a la PR-165. El predio en cuestión se utilizaría mayormente para depósito de relleno. Como se indicó en el memorial, CSA, Group, Inc. ha estado en conversaciones con el Cuerpo de Ingenieros y con el Departamento de Recursos Naturales para modificar la localización del dique y que éste se construya en el extremo oeste del predio y no atravesándolo, como originalmente había sido propuesto por dicha agencia federal.
Durante el trámite de la consulta, la Junta de Planificación determinó que, previo a la consideración de la solicitud, era necesario enmendar la Hoja 8 del Mapa de Zonas Susceptibles a Inundaciones. 
*1064 La solicitud de enmienda a la Hoja 8 fue presentada el 2 de marzo de 2001 por el Ing. Luis R. Rodríguez, de CSA, Group, Inc., una firma de arquitectos e ingenieros. En el formulario de la solicitud se identificó al Sr. Oscar Nevárez del Valle, como dueño del predio afectado.
Como indicamos al principio, el propósito de la solicitud de enmienda era modificar la clasificación de los terrenos de forma tal que aquella parte del predio en el cual se propone el desarrollo comercial que estaba clasificada como Zona 1 quedara clasificada como Zona 2. La reclasificación de los terrenos de Zona 1 a Zona 2 era necesaria para que la consulta progresara, porque en Zona 1 está prácticamente impedido el desarrollo.
Como requiere normalmente la Junta de Planificación, la solicitud de enmienda fue acompañada por una serie de documentos, entre ellos, por un memorial explicativo. En el memorial se describió el desarrollo comercial propuesto para el predio y la situación de éste en relación con los Mapas de Zonas Susceptibles a Inundaciones de la Junta de Planificación, así como, con los mapas de FEMA. Se describió en detalle el proyecto de control de inundaciones que estaba planificando el Cuerpo, de Ingenieros, el historial de las conversaciones sostenidas con dicha agencia y con el DRNA dirigidas a lograr la reubicación del dique propuesto con el propósito de liberar el predio objeto de la solicitud de enmienda. Se señaló la disposición de ambas entidades para considerar favorablemente una nueva alineación del dique. Se indicó, de hecho, que el Cuerpo de Ingenieros había aprobado reubicar el dique en la colindancia oeste del predio en cuestión (citando carta del 18 de febrero de 1999) y que el DRNA había determinado que la alineación del dique era viable (citando carta del 20 de abril de 1999).
El memorial de la solicitud de enmienda describió, similarmente, el estudio hidrológico hidráulico realizado para acompañar la solicitud y los requisitos, de acuerdo con el Reglamento de Planificación 13, que un proponente debía cumplir para solicitar la enmienda a los Mapas de Zonas Susceptibles a Inundaciones de la Junta de Planificación.
En el memorial explicativo de la enmienda se indicó, además, que la Evaluación Ambiental —otro requisito que debía acompañar, de acuerdo con los formularios de la Junta de Planificación, la solicitud correspondiente — , había sido sometida como parte de la consulta de ubicación 2000-13-0621-JPU, es decir, la que se había sometido para el desarrollo comercial. En efecto, entre los documentos sometidos durante el proceso de consideración de la consulta de ubicación del centro comercial Riverside Town Center, La Plata Development había incluido un formulario de Evaluación Ambiental. Véase, copia de la evaluación, Apéndice, Volumen 5, a las págs. 126-145. 
En el memorial explicativo que acompañó la solicitud de enmienda, sin embargo, no se hace la más mínima alusión a la construcción del puente de la PR-22 sobre el Río La Plata ni su efecto en la susceptibilidad a inundaciones del sector.
El 19 de junio de 2002, la Junta de Planificación celebró la vista pública requerida en relación con la solicitud de enmienda. En la vista comparecieron Pueblo y Decemcor con sus respectivos peritos. Estuvo presente también CSA, como proponente, y su perito.
Luego de celebrada la vista pública, Pueblo y Decemcor —y, posteriormente, en reacción a los dos primeros, CSA — , sometieron sendos escritos expresando su posición sobre la enmienda propuesta.
Paralelamente, el oficial examinador que había presidido la vista preparó el informe correspondiente, fechado el 4 de diciembre de 2001. El 22 de febrero de 2002, la Unidad de Inundaciones, tras recibir los escritos de las partes, sometió a la Oficina de Asuntos Legales un escrito titulado Coméntanos después de vista pública no considerados en el informe del examinador, en el que evaluó los señalamientos principales de los escritos y expresó ciertos comentarios de la Unidad. El 21 de marzo de 2002, el oficial examinador preparó, a su vez, un *1065 informe supletorio del anterior. Del mismo modo, la Oficina de Asuntos Legales emitió un par de opiniones sobre el asunto de la legitimación activa de los proponentes y la titularidad de los terrenos.
El 19 de junio de 2002, como hemos dicho, la Junta de Planificación aprobó la enmienda solicitada. El 11 de julio de 2002 se publicó un anuncio en la prensa en el cual se indicó la adopción de la Hoja 8 enmendada, la fecha a partir de la cual estaría expuesta al público —16 de julio de 2002— y la fecha de vigencia, 31 de julio de 2002.
En la resolución que adoptó la enmienda, la Junta de Planificación indicó, como puntos sustantivos, únicamente dos asuntos: primero, que había comprobado la legitimación activa de los proponentes y, segundo, que la delimitación anterior de la Zona 1 fue previo a la construcción de la PR-22 y del puente ubicado sobre el Río La Plata, estructuras que tuvieron el efecto de restringir el cauce mayor del río y convertir en Zona 2 el predio objeto de la petición.
Oportunamente, Pueblo y Decemcor solicitaron la revisión que nos ocupa.
En la solicitud de revisión, Pueblo y Decemcor alegan, esencialmente, que la modificación a la Hoja 8 se basa en un proyecto que no se ha construido aún —el dique propuesto por el Cuerpo de Ingenieros — . En específico, Pueblo y Decemcor señalan que la Junta de Planificación erró al aprobar la enmienda por las siguientes razones:

“1. no se identificaron adecuadamente los terrenos objeto de la enmienda;

2. el proponente no tenía legitimación activa para solicitar la enmienda;

3. se violaron los propósitos de la Ley para el Control de Edificaciones en Zonas Susceptibles a Inundaciones, Ley 3 de 27 de septiembre de 1961, según enmendada, 23 L.P.R.A. secs. 225 et seq., y del Reglamento 13;

4. la parte proponente no cumplió con los requisitos de notificación a los propietarios de los terrenos;

5. la Junta de Planificación no sometió la enmienda propuesta a FEMA, según requerido por el Reglamento de Planificación 13;

6. la Junta de Planificación no respondió a los comentarios significativos que hicieron las partes interesadas durante el proceso de reglamentación; y

7. la Junta de Planificación no cumplió con la Ley sobre Política Pública Ambiental, Ley 9 de 18 de junio de 1970, según enmendada, 12 L.P.R.A. secs. 1121-1142.”

Tanto CSA como la Junta de Planificación se opusieron a la expedición del auto de revisión.
En su oposición, CSA alega, esencialmente, que lo que hace la enmienda solicitada es actualizar la situación de los terrenos, cuya topografía e hidrología ya fue afectada por la construcción de la PR-22, situación que los planos anteriormente adoptados por la Junta de Planificación no reflejaban. CSA entiende que era deber de la Junta de Planificación haber modificado los planos motu proprio, pero que como no lo ha hecho, ellos se han visto forzados a solicitarlo.
Por otro lado, la Junta de Planificación, en oposición, comienza por relatar el proceso de adopción del Reglamento 13. Recuerda, a continuación, la deferencia debida a las decisiones de las agencias administrativas, *1066 sobre todo, en su función cuasi legislativa. Alega, además, la capacidad de la Junta de Planificación de eximir de algunos de los requisitos que establece el Reglamento 13 —cuando se demuestre, a su satisfacción, que no es necesario cumplir con los mismos — , que la decisión tomada por dicha agencia se basó en la totalidad del expediente, en los estudios sometidos por el proponente y en los comentarios emitidos por las agencias gubernamentales. Añade que si FEMA no se manifestó sobre la petición de enmienda, es porque no era necesario, pues la solicitud de enmienda no promovía un cambio en la delimitación de los mapas de FEMA y, de todos modos, la Junta de Planificación tenía capacidad para dispensar de tal requisito. En cuanto al cumplimiento de la Ley 9, indica que la enmienda solicitada a la Hoja 8 constituye una excepción categórica de las determinadas por la Junta de Calidad Ambiental, por lo que no requiere que se someta una declaración de impacto ambiental (DIA).
Luego de varios escritos posteriores sometidos por las partes en tomo a la revisión, estamos en posición de resolver. De los errores señalados, analizaremos de modo global aquéllos que consideramos cruciales para nuestra determinación.
II
Como es sabido, la función revisora de los tribunales con respecto a las determinaciones de los organismos administrativos es de carácter limitado. Rebollo v. Yiyi Motors, 160 D.P.R. _ (2004), 2004 J.T.S. 4. Las decisiones de las agencias administrativas tienen a su favor una presunción de legalidad y corrección, la cual debe ser respetada por los tribunales mientras la parte que las impugna no produzca suficiente evidencia para derrotarlas. Misión Ind. P.R. v. J.P., 146 D.P.R. 65 (1998). Las determinaciones de los organismos administrativos especializados merecen gran consideración y respeto. Mun. de San Juan v. J.C.A., 152 D.P.R. _ (2000), 2000 J.T.S. 193.
En nada es esto más evidente que en el caso de las funciones cuasi legislativas de las agencias.
Es un principio ya plenamente reconocido, como parte del derecho administrativo, la delegación a las agencias gubernamentales, de poderes para reglamentar bajo criterios amplios, permitiéndoles a éstas gran discreción en el desarrollo y ejecución de la política pública. Viajes Gallardo v. Clavell, 131 D.P.R. 275 (1992); Luán Investment Corp. v. Román, 125 D.P.R. 533 (1990); M. & B. S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319 (1987).
A pesar de la deferencia que normalmente muestran los tribunales hacia esa facultad de reglamentar de las agencias, sin embargo, y a pesar de la presunción de validez y de regularidad de las actuaciones administrativas, compete a los tribunales en última instancia examinar su validez jurídica. Asoc. Res. Park Side, Inc. v. J.P., 147 D.P.R. 277 (1998). Después de todo, el ejercicio del poder de reglamentar de la agencia “debe estar enmarcado en el ámbito de los poderes delegados a la agencia por la Legislatura y debe ser compatible con las disposiciones de los reglamentos que rigen en materia de ... planificación en nuestro país”. Id., a la pág. 287. (Enfasis suplido.)
En ese sentido, la función de los tribunales al revisar las actuaciones cuasi legislativas de las agencias debe ir dirigida a evaluar: (1) si la actuación administrativa está autorizada por la ley; (2) si se delegó poder de reglamentación; (3) si la reglamentación promulgada está dentro de los amplios poderes delegados; (4) si al aprobarse el reglamento se cumplió con las normas procesales de la ley orgánica y de las leyes especiales', y (5) si la reglamentación es arbitraria o caprichosa. Asoc. Fcias. Com. v. Depto. de Salud, 156 D.P.R. _ (2002), 2002 J.T.S. 18; Montoto v. Lorie, 145 D.P.R. 30 (1998); Luán Investment Corp. v. Román, supra. Le corresponde a la parte que impugna la validez de una determinación de la agencia, por otro lado, demostrar su invalidez. Asoc. Res. Park Side, Inc. v. J.P., supra.
Qué constituye una reglamentación arbitraria o caprichosa es algo que tienen que determinar, caso a caso, *1067 los tribunales en su función revisora. 
En Asoc. Fcias. Com. v. Depto. de Salud, supra, el Tribunal Supremo de Puerto Rico tuvo la oportunidad de examinar ampliamente este asunto y de citar jurisprudencia norteamericana en la que se ha explorado el tema. Es permisible acudir al Common Law cuando ello es necesario para interpretar normas de origen anglo-estadounidense, como es el derecho administrativo. Véase, P.R. Fuels, Inc. v. Empire Gas Co., Inc., 149 D.P.R. _ (1999).
En Asoc. Fcias. Com. v. Depto. de Salud, supra, el Tribunal Supremo de Puerto Rico citó a Motor Vehicle Mfrs. Assn. v. State Farm Mut., 463 U.S. 29 (1983):
"... Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. ”
Motor Vehicle Mfrs. Assn. v. State Farm Mut., supra, a la pág. 43. (Enfasis suplido.)
Del mismo modo, ha indicado dicho foro que sostendrían "... a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle, supra, citando a Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281 (1974).
El Tribunal Supremo de Puerto Rico incorporó este tipo de razonamiento —identificado a menudo como la doctrina de cuestiones vitales — , como dijo, en Asoc. Fcias. Com. v. Depto. de Salud, supra. La doctrina de cuestiones vitales impone a la agencia la obligación de responder, durante el proceso de adopción de reglamentación, a los principales señalamientos de los opositores. La agencia debe explicar, de manera breve y concisa, porqué las sugerencias no fueron adoptadas y cómo los problemas señalados por los ciudadanos fueron resueltos por la agencia. La doctrina descansa en el hecho de que la agencia, por poseer un poder delegado de legislar, no tiene el poder amplio que tiene la Asamblea Legislativa, y tiene, por lo tanto, la obligación de explicar sus actuaciones.
CSA argumenta que la enmienda a la Hoja 8 no constituye un procedimiento adjudicativo, por lo que la Junta de Planificación no tiene que expresar las determinaciones de hechos y de derecho en que basa su determinación. Señala, además, que en el expediente de la Junta de Planificación se demuestra que la agencia, en efecto, consideró los señalamientos de los opositores, pues existen en el expediente copia de los informes de la división legal y de la unidad que atiende lo relativo a las Zonas Inundables, en donde se indican las posiciones de los opositores.
Como indicó el Tribunal Supremo de Puerto Rico citando las expresiones del Tribunal Supremo federal en Motor Vehicle, supra, “una agencia que cambia su curso de acción al derogar un reglamento está obligada a suplir un análisis razonado del cambio”. Asoc. Fcias. Com. v. Depto. de Salud, 2002 J.T.S. 18, a la pág. 679.
En Asoc. Fcias., el Tribunal Supremo de Puerto Rico determinó que era necesario incluir —tanto en el informe de la vista pública como en la exaltación breve y concisa que acompaña la regla o reglamento aprobado — , una declaración de hallazgos y razones, con respuesta a los comentarios recibidos de parte de los ciudadanos. Véase, Asoc. Fcias. Com. v. Depto. de Salud, 2002 J.T.S. 18, a las págs. 678-679. “El requisito de esta ‘explicación breve y concisa’ en el reglamento final existe para garantizar que los tribunales podamos ejercitar nuestra función revisora de una manera efectiva. ” Id., a la pág. 679.
*1068 No basta, como alega CSA, que aparezca en los informes de la agencia el análisis de las ponencias del proponente o de los opositores. Ni siquiera basta cuando, como en contadas excepciones en este caso, se incluyen en el informe técnico la opinión o recomendaciones del personal técnico de la Junta de Planificación.
En Asoc. Fcias. Com. v. Depto. de Salud, supra, el Tribunal Supremo elaboró sobre ambos requisitos: el requisito del informe —que en ese caso no figuraba en el expediente de la agencia — , y el requisito, como vimos, de que en la exaltación breve y concisa que acompaña la regla o reglamento aprobado se incluya “un análisis razonado del cambio”. Asoc. Fcias. Com. v. Depto. de Salud, supra.
En el caso ante nos, los informes frecuentemente no llegan a conclusiones o, en ocasiones, recomiendan, como en algunas instancias en este caso, un curso de acción distinto del que la Junta de Planificación finalmente tomó. Después de todo, es la agencia —en nuestra revisión, la Junta de Planificación— la que toma una decisión y emite una resolución. Muchas veces, el organismo gubernamental toma un curso de acción que no necesariamente coincide con el de los informes. No basta que en el expediente aparezcan mencionados los asuntos traídos por las partes con interés ni las contestaciones del proponente. Es necesario que la agencia se exprese al adoptar la reglamentación. De ese modo, se permite que los tribunales ejerzamos nuestra función revisora. Asoc. Fcias. Com. v. Depto. de Salud, supra.
En la revisión que nos ocupa, por otro lado, la exaltación breve y concisa que debe acompañar la nueva reglamentación —la resolución de la Junta de Planificación JP-047-ZI, que adopta la enmienda de la Hoja 8 — , es sumamente parca:

“Considerada toda la información obrante en el expediente y ofrecida en la vista pública, esta Junta resuelve que se demostró la capacidad jurídica (legitimación activa) de los titulares del predio para promover la enmienda. Resuelve, además, que la delimitación anterior de la Zonal en el predio objeto de la solicitud de enmienda fue previo a la construcción de la PR-22 y del puente ubicado sobre el Río La Plata. La construcción del puente y sus estribos restringen el cauce mayor del Río La Plata liberando la Zona 1 y convirtiéndolo a Zona 2 los terrenos objeto de la petición de enmienda. ”

Apéndice, Vol. 1, a las págs. 4-5.
Por las razones que exponemos a continuación, la trayectoria de la Junta de Planificación, su línea de razonamiento, no ha sido ni clara ni traduce el rol que debe tener la Junta de Planificación en guiar el desarrollo y velar por la seguridad pública. La Junta de Planificación no ha demostrado poseer la pericia y el conocimiento especializado (expertise) que amerita la deferencia de los tribunales, ni en el aspecto técnico ni en los aspectos de derecho. Veamos.
III
La Junta de Planificación es un organismo creado para proteger los intereses y el bienestar de la ciudadanía en general en el descargo de la política pública de planificación. Montoto v. Lorie, supra; E.L.A. v. Domínguez, 104 D.P.R. 468 (1975). En específico, el inciso 4 del Art. 11 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley 75 de 24 de junio de 1975, según enmendada, 23 L.P.R.A. see. 62 et seq., le confiere facultad para adoptar y aprobar los reglamentos que le autoriza la propia Ley de Planificación o cualquier otra ley para cualquier fin especial. 23 L.P.R.A. sec. 62j (Supl. 2003). La fuente del poder de reglamentación de la Junta de Planificación es, en última instancia, el poder del Estado de regular la propiedad privada para salvaguardar la salud, la seguridad y el bienestar de sus ciudadanos. Luán Investment Corp. v. Román, supra.
De otro lado, los Arts.l y 3 de la Ley 3, supra, imponen a la Junta de Planificación la obligación de declarar como “Zona Susceptible a Inundaciones”, cualquier área o sector que resulte peligroso, perjudicial o contrario a la seguridad, entre otros, por efecto de lluvias, crecientes, marejadas y otros fenómenos similares, “con el *1069 objetivo de reducir o eliminar las pérdidas de vida o haciendas por efectos de inundaciones23 L.P.R.A. secs. 225 y 225b.
En virtud de la referida Ley 3, supra, la Junta de Planificación adoptó, el 30 de enero de 1972, el Reglamento de Planificación 13, supra. En términos de contenido, dicho reglamento ha sufrido a través de los años varias enmiendas. Al momento de presentarse la solicitud de enmienda, el 2 de marzo de 2001, estaba vigente la Tercera extensión de dicho reglamento, con vigencia de 28 de febrero de 1992. Al momento de emitir la decisión (19 de junio de 2002), la Junta de Planificación había aprobado una nueva revisión del Reglamento 13, con vigencia de 20 de abril de 2001. 
En la vista pública celebrada para la consideración de la solicitud de enmienda a la Hoja 8, Decemcor — tanto a través de su perito como de su abogada — , planteó sus dudas sobre la validez de la adopción del Reglamento 13, en la versión de 2001. Véase, informe del oficial examinador, apéndice, Vol. 4, a la pág. 1042. Se plantearon esas dudas, además, en el escrito en oposición presentado por Decemcor (Apéndice, Vol. 3, a las págs. 675-676) y en el escrito presentado por su consultor, Ing. Angel Herrera (Apéndice, Vol. 3, a las págs. 679-680, 682-686). Decemcor planteó que la solicitud de enmienda a la Hoja 8 se presentó a base de obras propuestas, posibilidad que el Reglamento de 1992 no permitía. 
CSA, al contestar a dicho señalamiento, lo aceptó e indicó, sencillamente, que el Reglamento 13 que debía utilizarse era el de 1992, porque era el que estaba vigente al momento de la presentación de la solicitud de enmienda. Indicó que el mapa de inundaciones vigente no había tomado en cuenta la construcción de la PR-22 y el puente de dicha vía —que se trataba de una obra realizada ya por el hombre que justificaba la solicitud de enmienda. Señaló, por lo tanto, que no era necesario examinar la validez de la adopción del Reglamento 13 de 2001. Véanse, apéndice, Vol. 4, a las págs. 799-800.
Es decir, CSA aprovechó el señalamiento para indicar, tardíamente, que la solicitud de enmienda presentada se basaba, únicamente, en obra construida, a pesar de que, en el memorial de la solicitud que presentó mientras estuvo vigente, efectivamente, el Reglamento 13 de 1992, se describió extensamente la obra a construirse por el Cuerpo de Ingenieros y las gestiones realizadas por CSA para la realineación del dique, pero no se había hecho ninguna indicación de la PR-22 o la obra ya realizada. Véase, Memorial de la solicitud de enmienda, apéndice, vol. 2, a las págs. 285-289.
En un informe preparado por la Unidad de Inundaciones de la Junta de Planificación, Comentarios después de vista pública no considerados en el informe del examinador —informe posterior a la vista pública y al primer informe del oficial examinador — , se indicó, en relación con el asunto del Reglamento 13 aplicable, lo siguiente:
“... Podemos comentar en adición, que aunque la Solicitud de Enmienda fue radicada el 2 de marzo de 2001, por lo que estaba vigente el Reglamento Núm. 13 de 28 de febrero de 1992, la Junta tomará su decisión a base de la reglamentación vigente que no necesariamente es la anterior. ”
Apéndice, Vol. 4, a la pág. 1045.
El oficial examinador, en el informe supletorio, discutió a su vez el asunto del reglamento. Hizo referencia a la Opinión del Secretario de Justicia 1970-30, sobre cuál era el reglamento vigente. Señaló que “lo determinante en estos casos no es la reglamentación vigente a la fecha de radicación ... sino aquélla que rija al momento de efectuarse la correspondiente determinación.” Concluyó diciendo, sin embargo, que, para los efectos de la solicitad de enmienda, ésta se basaba en obras ya construidas (la carretera PR-22 y el puente) y no en un futuro dique por construir. Apéndice, Vol. 4, a las págs. 1048-1049.
*1070 La Junta de Planificación —el organismo directivo, que es quien tiene la facultad de tomar la decisión final — , sin embargo, no se expresó.
En la revisión que nos ocupa, era importante que la Junta se expresara claramente sobre cuál era el reglamento aplicable, por distintas razones.
En primer lugar, como indicó el oficial examinador en el informe supletorio, al citar la Opinión del Secretario de Justicia 1970-30, en materia de Planificación, la práctica prevaleciente determinante es utilizar como base para la consideración de las solicitudes, la reglamentación vigente al momento de efectuarse la correspondiente determinación y no la vigente a la fecha de la presentación de la solicitud. Citamos de la opinión del Secretario de Justicia:

Como regla general, una mera solicitud de permiso no crea un derecho a favor del peticionario; por lo tanto, si hay un cambio en las condiciones requeridas para la expedición del permiso, antes de emitirse decisión sobre una solicitud pendiente, entiendo que tal decisión debe basarse en las disposiciones en vigor en este momento. No aplica la anterior regla, sin embargo, cuando el solicitante ha actuado de buena fe basándose en algún tipo de autorización.

... Lo determinante en estos casos no es la reglamentación vigente a la fecha de radicación de estas solicitudes, sino aquélla que rija al momento de efectuarse la correspondiente determinación por la agencia. Sin embargo, pueden existir situaciones en que, habiéndose incurrido en un gasto sustancial basándose en el [reglamento] anterior, se justificase una excepción a la anterior norma, en cuyo caso habrá que hacer determinaciones para cada caso individual, dependiendo de los hechos peculiares que presenten. ”

Opinión del Secretario de Justicia 1970-30. (Notas al calce omitidas.)
Esto parece ser contrario a la actitud prevaleciente en la doctrina en torno a la retroactividad de las leyes. Como es sabido, el Art. 3 del Código Civil de Puerto Rico preceptúa que "[l]as leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario" y, "[e]n ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior". 31 L.P.R.A. sec. 3. Como ha indicado el Tribunal Supremo, no obstante, esta disposición "sólo tiene el alcance de una regla general de interpretación de estatutos. No es un principio rígido de aplicación absoluta". Aponte v. Barbosa Dieppa, 146 D.P.R. 558, 569 (1998). Es decir, tanto en materia de permisos como en la aplicabilidad retroactiva de las leyes, se trata de un asunto que es necesario examinar caso a caso.
De otro lado, como sabemos, la controversia en la revisión que nos ocupa se trata de una enmienda a un mapa de zonas susceptibles a inundaciones.
CSA argumenta, en primer lugar, que en el caso de autos se trata de una enmienda a un mapa, y que una enmienda a un plano no constituye una enmienda al reglamento. Véase, escrito en oposición de CSA, a la pág. 16. Este argumento es insostenible. Los mapas constituyen parte intrínseca del reglamento y una enmienda a los mapas constituye una enmienda al reglamento.
De acuerdo con las disposiciones del Reglamento 13 —en las versiones de 1992, 2001 y 2002, los cuales incluyen una disposición similar — , los Mapas de Zonas Susceptibles a Inundaciones forman parte integral del reglamento:

*1071
“A partir de sus respectivas fechas de vigencia, todo mapa de zonas susceptibles a inundaciones o enmiendas a éste, formará parte del presente Reglamento. ”

Reglamento 13, Sec. 4.01. Véanse, Reglamento 13 de 1992, a la pág. 19; versión de 2001, a la pág. 22; y versión de 2002, a la pág. 33.
En ese sentido, se trata efectivamente de una enmienda reglamentaria que, como tal, tiene que cumplir con los reglamentos procesales aplicables. Como expresó el Tribunal Supremo, al adoptar los mapas de zonificación —o, como en nuestro caso, de zonas susceptibles a inundaciones, por extensión — , la Junta de Planificación actúa en el ejercicio de un poder legislativo delegado. Luán Investment Corp. v. Román, supra. De igual manera, las enmiendas a dichos mapas, emitidas en el ejercicio de ese poder delegado, deben seguir, igualmente, un proceso cuasi legislativo para que sean válidas. Id.
En el caso de los mapas de zonas susceptibles a inundaciones, el propio Reglamento 13 establece, en la See. 4.04, el procedimiento específico que se utilizará para las Enmiendas a los Mapas.
La dificultad estriba en que, sobre el aspecto particular de las enmiendas a los mapas de zonas susceptibles a inundaciones, las disposiciones de la Sec. 4.04 del Reglamento 13 variaron significativamente en las dos versiones que nos interesan. Véanse, Reglamento 13 de 1992, a las págs. 19-20; versión de 2001, a las págs. 23-24. Hubo modificaciones en las circunstancias en que se podía solicitar la enmienda, en los requisitos de notificación e, incluso, en los requisitos de los cuales la Junta podía eximir su cumplimiento. A modo de ilustrarlo, el Reglamento de 1992, en términos generales, permitía enmiendas “cuando ocurra un cambio en la extensión o en otras características de una zona declarada susceptible a inundaciones motivadas por efecto de la naturaleza o por obras realizadas por el hombre u otras razones técnicas”.
El Reglamento 13 de 2001, por otro lado, permitía enmiendas “cuando se proponga u ocurra un cambio en la extensión o límites o en otras características de una zona declarada susceptible a inundaciones por efecto de la naturaleza o por obras propuestas o a realizarse por el hombre u otras razones técnicas, incluyendo la actualización de estudios vigentes a base de nueva información”. Véase, Sec. 4.04, Reglamento 13 de 2001, ala pág. 23.
Es decir, como se ha indicado repetidamente durante el proceso ante la Junta de Planificación bajo la versión de 1992, sólo podían solicitarse enmiendas, en lo que nos atañe, a base de obras ya realizadas por el hombre. Véase, Sec. 4.04, Reglamento 13 de 1992, a la pág. 19. La versión de 2001, por otro lado, permitía que se solicitaran enmiendas a base de obras propuestas y establecía el procedimiento para estos últimos casos.
De modo similar, varían en la versión de 2001 del Reglamento 13 los requisitos de notificación a los propietarios de los terrenos afectados. Véase, nuevo inciso (7), Sec. 4.04, Reglamento 13 de 2001, a la pág. 24.
Muchos de los errores alegados por Pueblo y Decemcor en el presente recurso y muchos de los señalamientos realizados por ellos durante el proceso, tienen su origen en los cambios efectuados en el Reglamento 13 y la incapacidad de la Junta de Planificación de expresarse al respecto.
No le corresponde a la parte proponente, CSA, decidir —a mitad del proceso, como lo hizo cuando contestó a los señalamientos de Pueblo y Decemcor — , bajo qué reglamentación ha sometido la solicitud de enmienda. Sobre todo, cuando el expediente sugiere que la solicitud de enmienda fue presentada inicialmente a base de obras propuestas. Véase, nuestra anterior discusión sobre el memorial explicativo que acompañó a la solicitud de enmienda, a las págs. 5-6.
Es de común conocimiento la obligación de las agencias administrativas de cumplir con sus propios *1072 reglamentos, una vez los adopta. Como ha indicado el Tribunal Supremo, la Junta de Planificación debe establecer procedimientos claros y precisos que salvaguarden los derechos del ciudadano. Como agencia reguladora, debe velar porque los requisitos estatutarios establecidos en sus reglamentos se cumplan. Montoto v. Lorie, supra; Luán Investment Corp. v. Román, supra. Más aún, la Junta de Planificación tiene una obligación de salvaguardar vida y propiedad. 23 L.P.R.A. sec. 225.
En la revisión que nos ocupa, la incapacidad de la Junta de Planificación de esbozar en la resolución recurrida los principales señalamientos traídos por los opositores —y, sobre todo, aquellos señalamientos, como cuál era el reglamento que regía, que eran cruciales para la consideración de la solicitud de enmienda — •, privan a este Tribunal de ejercer adecuadamente nuestra función revisora y los señalamientos de error de los opositores. El procedimiento en el caso de autos distó mucho de los procedimientos claros y precisos que dicta la jurisprudencia.
Reconocemos, en la revisión que nos ocupa, que Pueblo y Decemcor, como posibles competidores del centro comercial a establecerse, tienen, primordialmente, un interés comercial en oponerse a Riverside Town Center y, en consecuencia, a la solicitud de enmienda a la Hoja 8. Como argumenta Pueblo en su réplica, el Tribunal Supremo ha reconocido el interés legítimo que pueden tener los competidores comerciales en los procedimientos ante las agencias administrativas. San Antonio Maritime v. P.R. Cement Co., 153 D.P.R. _ (2001), 2001 J.T.S. 20. Además, la propia Ley 3, supra, fomenta, mediante los anuncios requeridos en los medios, la participación pública. Véase, 23 L.P.R.A. sec. 225b.
En ese sentido, quién mejor que dos competidores comerciales de la capacidad económica que poseen, en la presente revisión, Pueblo y Decemcor, por un lado, y los intereses que representa CSA, por el otro, para, como indicó el Tribunal Supremo en San Antonio Maritime v. P.R. Cement Co., supra, “señalar las irregularidades... provocadas por otro participante del mismo mercado”. San Antonio Maritime v. P.R. Cement Co., 2001 J.T.S. 20, a la pág. 860.
Es por ello que, en este tipo de caso, la Junta de Planificación tiene que desempeñar un papel directivo y efectivo, desde el punto de vista de sus determinaciones tanto técnicas como de derecho. La Junta de Planificación tiene que ser precisa en sus determinaciones y demostrar la pericia y experiencia que posee. Los vaivenes que se evidencian en el expediente ante nos y el hecho de la Junta no haber expresado claramente su posición, además de dificultar nuestra labor revisora, retardan el proceso y permiten que sean los proponentes y los opositores los que determinen el curso de los procedimientos.
IV
Existen algunos asuntos adicionales que debemos considerar.
Pueblo y Decemcor alegan que la Junta de Planificación tenía obligación de notificar a FEMA la enmienda propuesta. En efecto, la Sec. 4.04 del Reglamento 13 dispone que, “[djurante el proceso de revisión, la Junta someterá la propuesta a la Agencia Federal sobre Manejo de Emergencias (FEMA) para sus recomendaciones”. No hay evidencia en el expediente de que, en efecto, dicha notificación se haya hecho.
La Junta de Planificación reconoce que el Reglamento 13 exige la notificación a FEMA. Indica, sin embargo, que la ley habilitadora de la Junta de Planificación le confiere autoridad para dispensar del cumplimiento de algunos requisitos y que, en virtud de esa facultad, fue que no se consultó a FEMA.
La única alusión a la participación de la agencia federal FEMA —la carta que envió CSA al presidente de la Junta de Planificación el 26 de agosto de 2001 — , indica que en la reunión sostenida entre representantes de CSA, Junta de Planificación y la Sra. Iris Delgado, de FEMA, se determinó que, de acuerdo con la reglamentación federal, no era necesario enmendar el mapa de FEMA. La reglamentación federal permite, *1073 según se señala en la referida carta, que una vez se realice el relleno correspondiente, se proponga una enmienda al mapa a base del depósito de relleno realizado (“Letter of Map Revisión Based on Fill”), acompañado de un plano que muestre la elevación del terreno después de depositado el relleno (“as built'). No cuestionamos la veracidad de esa aseveración.
No obstante, es cuestionable la aseveración que realiza CSA, a saber:

“En resumen, en este caso, la reglamentación aplicable no requiere la participación de FEMA en el proceso de enmienda al Mapa de Zonas Susceptibles a Inundación de la Junta de Planificación. Le agradeceremos que la Junta de planificación tome conocimiento de lo anteriormente expuesto. ”

Apéndice, vol. 3, a la pág. 610.
CSA concluye que, en consecuencia, no es necesaria la participación de FEMA en el proceso de enmienda al Mapa de Zonas Susceptibles a Inundación. Evidentemente, no tiene razón. Después de todo, en la revisión que nos ocupa, no se trata de una enmienda a los mapas de FEMA. CSA solicitó una enmienda a la Hoja 8 de los Mapas de Zonas Inundables de la Junta de Planificación. Y, como vimos, las enmiendas a dicho reglamento, o a sus mapas, requieren específicamente la participación de FEMA en el proceso de enmienda. Véase, See. 4.04 del Reglamento 13, en sus versiones de 1992 y de 2001.

Falta de cumplimiento con la Ley 9

Pueblo y Decemcor argumentan que la Junta de Planificación no cumplió con la Ley sobre Política Pública Ambiental porque no presentó una declaración de impacto ambiental (DIA).
CSA y la Junta de Planificación admiten que no se preparó ningún documento ambiental. Argumentan que la DIA no era necesaria porque formaba parte de unas exclusiones categóricas que la Junta de Calidad Ambiental había aprobado mediante la Resolución R-87-10-1, de 2 de abril de 1987.
Pueblo y Decemcor alegan que dichas exclusiones categóricas no están vigentes porque fueron derogadas al adoptar la Junta de Calidad Ambiental el Reglamento de la Junta de Calidad Ambiental para el Proceso de Presentación, Evaluación y Trámite de Documentos Ambientales, Reglamento 6026 de 29 de septiembre de 1999. Dicho reglamento entró en vigor el 28 de octubre de 1999.
Cuando se aprobó el Reglamento 6026, supra, éste concedió un período de 180 días a partir de su vigencia, para que las agencias que desearan conservar exclusiones categóricas previamente concedidas, lo solicitaran. Véase, Regla 237(A) y (B). Las agencias podían solicitar, además, dentro del mismo período, otras exclusiones categóricas de la JCA.
La Junta de Planificación sometió una resolución a esos efectos —Resolución para solicitar exclusiones categóricas — , el 29 de marzo de 2000. La JCA no ha tomado acción alguna sobre dicha petición, según certificó la Secretaria de la Junta de Gobierno el 7 de febrero de 2003. 
Como indica el segundo inciso del Reglamento citado [Regla 237(B)], cuando la agencia ha sometido una modificación de las exclusiones ya aprobadas, éstas continuarán vigentes hasta tanto la JCA se exprese sobre la nueva solicitud. En el caso de autos, por lo tanto, conforme a lo indicado por la JCA el 7 de febrero, la Resolución R-87-10-1 continúa vigente.
De todos modos, aun estando vigentes las exclusiones categóricas, éstas no excluyen del requisito de la DIA para enmiendas al Reglamento 13 de la Junta de Planificación, con excepción de las enmiendas que se sometan *1074 para atemperar los planos de la Junta de Planificación a los planos de FEMA. Como es sabido, los tribunales tenemos la obligación de interpretar las leyes —y, en consecuencia, los reglamentos— en concordancia unas partes con las otras.
En el caso de autos, FEMA no fue la entidad que presentó la solicitud de enmienda de los planos. De hecho, ni siquiera se le solicitó comentarios a dicha agencia.
Al estar vigente la Resolución R-87-10-1, y no tratarse de una enmienda propuesta por la propia Junta de Planificación para atemperar los mapas de zonas susceptibles a inundaciones a los de FEMA, no se trata de una exclusión categórica.
Entendemos que era necesario someter el documento de evaluación ambiental, según requerido por la Ley 9. Pueblo y Decemcor señalan que en Salas Soler v. Secretario de Agricultura, 102 D.P.R. 716 (1974), el Tribunal determinó que la promulgación de un reglamento puede ser una acción gubernamental significativa que tenga un impacto significativo sobre el ambiente, por lo que sería aplicable la Ley 9.
El oficial examinador, en el informe supletorio que realizó luego de la vista pública, indica que la enmienda al mapa no constituye una acción según definida por la Ley 9, supra. Según expresa, lo que constituía la acción era la construcción de la PR-22 y del puente, el mismo argumento que utilizó CSA. Véase, apéndice, Vol. 4, a la pág. 1048. Como vimos, dicha aseveración es incorrecta.
V
Por los fundamentos anteriormente expuestos, revocamos la resolución emitida por la Junta de Planificación que enmendó la Hoja 8 y devolvemos el caso para que se reevalúe la solicitud de enmienda conforme a .derecho y conforme a lo expuesto en esta opinión.
Lo acordó y manda el Tribunal y lo certifica la señora Secretaria General.
Aida Ileana- Oquendo Graulau
Secretaria General
ESCOLIOS 2004 DTA 54
1. Decemcor, S.E. y P.C.M.E. Comercial, S.E. (en adelante, Decemcor) son propietarias del centro comercial Plaza Gran Caribe Malí, localizado en la PR-2, Km. 29.7 en Vega Alta, y fueron aceptadas como interventoras por la Junta de Planificación en el proceso de aprobación de la consulta de ubicación 2000-13-0621-JPU, a la que nos referiremos más adelante. Tanto Decemcor como Pueblo comparecieron a la vista pública celebrada para consideración de la solicitud de enmienda y solicitaron autorización para someter su oposición a la petición.
2. La Plata Development Corporation es una corporación, según el formulario de la consulta, debidamente incorporada en el Departamento de Estado de Puerto Rico.
3. El 17 de mayo de 2002, la Junta de Planificación emitió una resolución, en el caso de la consulta, mediante la cual determinó archivar la consulta de ubicación hasta que se resolviera la enmienda a la Hoja- 8. Véase, Apéndice, Vol. 8, a las págs. 1711-1712.
4. En el memorial no se indicó la fecha de vigencia del Reglamento 13, infra, que se estaba utilizando.
5. El 30 de agosto de 2001, la Junta de Calidad Ambiental indicó a la Junta de Planificación que no bastaba el documento de evaluación ambiental (EA) sometido para Riverside Town Center en el caso de la consulta de ubicación y que La Plata Development tenía que someter, como parte de la consulta, una Declaración de Impacto Ambiental Preliminar (DIA-P). Véase, Apéndice, Vol. 8, a las págs. 1491-1493.
*1075 6. Para casos en los que el Tribunal Supremo de Puerto Rico haya examinado si una reglamentación es arbitraria y caprichosa, véanse, i.e., Carrero v. Depto. Educación, 141 D.P.R. 830 (1996); Aulet v. Depto. Servicios Sociales, 129 D.P.R. 1 (1991); Santiago v. Tribunal Examinador de Médicos, 118 D.P.R. 1 (1986).
7. No se trata, sin embargo, de las determinaciones de hechos y conclusiones de derecho que tendría que expresar la agencia en una determinación adjudicativa, dirigida a resolver una controversia en particular entre una o más personas. Véase, Luán Investment Corp. v. Román, supra.
8. El 25 de febrero de 2002, la Junta de Planificación aprobó una Quinta revisión del Reglamento de Planificación 13, después de celebrar vistas públicas y de someter el documento ambiental correspondiente. Esta quinta revisión, con fecha de vigencia de 5 de septiembre de 2002, es el que está vigente en la actualidad.
9. Se cuestionó si la adopción del Reglamento 13 de 2(101 había cumplido con la Ley de Política Pública Ambiental, supra, y si había sido sometido para la firma del Gobernador, como lo exige la Ley Orgánica de la Junta de Planificación, supra.
10. Somos conscientes de que este no es el foro ni el momento adecuado para dilucidar la validez de la Cuarta revisión del Reglamento 13 adoptada en el 2001. Ese no es el asunto que nos ocupa.
11. La Sec. 4.04 fue modificada nuevamente en la extensión adoptada en el 2002. Véase, Reglamento 13, versión de 2002, a las págs. 34-37.
12. Véase nuestra anterior discusión sobre la carta de CSA a la Junta de Planificación en la que discutió los señalamientos de los opositores, a las págs. 16-17 de este escrito.
13. Somos conscientes de que el Tribunal Supremo determinó en San Antonio Maritime v. P.R. Cement Co., supra, que se trataba de un procedimiento adjudicativo y no cuasi legislativo como en nuestro caso. Entendemos, no obstante, que el razonamiento es similar. De todas maneras, la Junta de Planificación permitió la participación de ambas entidades, Pueblo y Decemcor, en la vista pública y su posterior sometimiento de escritos.
14. La JCA certificó además que como no ha considerado la nueva petición, las anteriores exclusiones categóricas decretadas en la Resolución R-87-10-1 todavía están vigentes.